WILLIAM J. BREMER, JR., AND CAROLYN E. BREMER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8064-74—8069-74, 4066-75.   Filed May 27, 1976.

*Erwin A. Friedman* and *Bruce A. Howe,* for the petitioners.
*Edward P. Phillips,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in respect of petitioners' Federal income tax for the taxable year ended December 31, 1970, as follows:

| Docket No. | Petitioners | Deficiency | Addition to tax under sec. 6651(a), I.R.C. 1954[2] |
|---|---|---|---|
| 8064-74 | William J. Bremer, Jr., and Carolyn E. Bremer | $562.20 | - - - |
| 8065-74 | Milton Mazo | 8,137.99 | - - - |
| 8066-74 | Irwin Mazo and Julie Mazo | 8,138.26 | - - - |
| 8067-74 | Barney L. Sadler and Ruth S. Sadler | 8,629.99 | - - - |
| 8068-74 | Marvin I. Rosenzweig and Gail Rosenzweig | 7,661.07 | - - - |
| 8069-74 | Harry Minkovitz and Hazel Minkovitz | 1,355.97 | - - - |
| 4066-75 | Erwin A. Friedman and Mary W. Friedman | 2,842.29 | $426.34 |

Certain issues having been disposed of by the parties, the sole question presented is whether the foreclosure sale of the assets of

---

[1] Cases of the following petitioners are consolidated herewith: Milton Mazo, docket No. 8065-74; Irwin Mazo and Julie Mazo, docket No. 8066-74; Barney L. Sadler and Ruth S. Sadler, docket No. 8067-74; Marvin I. Rosenzweig and Gail Rosenzweig, docket No. 8068-74; Harry Minkovitz and Hazel Minkovitz, docket No. 8069-74; and Erwin A. Friedman and Mary W. Friedman, docket No. 4066-75.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years involved herein.

the Savannah Inn & Country Club, Inc., a subchapter S corporation of which petitioners were shareholders, constitutes a disposition within the meaning of section 47(a)(1) such that petitioners are liable for the investment credit recapture tax as determined by respondent.

## FINDINGS OF FACT

Most of the facts have been stipulated and are accordingly so found.

With the exception of petitioner Milton Mazo (docket No. 8065-74), who filed an individual income tax return for 1970, the petitioners in each of the respective dockets are husband and wife and filed a joint income tax return for 1970. Petitioners William J. Bremer, Jr., and Carolyn E. Bremer also filed an amended joint return for 1970. Each of these Federal income tax returns for 1970 was filed with the Internal Revenue Service Center, Chamblee, Ga. The petitioners were each residents of Georgia at the time the petitions herein were filed.

On August 18, 1965, the General Oglethorpe Resort Hotel Corp. was organized under the laws of Georgia. The name of the corporation was changed several times until it became known as the Savannah Inn & Country Club, Inc. (hereinafter sometimes referred to as Savannah). In August 1967 Savannah duly elected to be taxed pursuant to the provisions of subchapter S. Each of the male petitioners herein was a shareholder of Savannah.[3]

For its taxable year beginning August 1, 1967, and ending December 31, 1967, Savannah claimed an investment credit in the amount of $67,816.67 for certain assets which were placed in service by Savannah on or about August 1, 1967, and of which each had a useful life of at least 4 years.

As a shareholder of Savannah, each of the male petitioners claimed a pro rata share of Savannah's investment credit on his Federal income tax return for 1967, based on his proportionate ownership of Savannah and his tax liability in the various years. The percentage ownership of Savannah and the amount of the investment credit claimed and applied in the various years, for each petitioner, are as set forth below:

---

[3] See *Irwin Mazo,* T.C. Memo. 1973-125, for litigation concerning the continuing qualification of Savannah as a subch. S corporation after a refinancing arrangement.

| Petitioners | Ownership of Savannah | Investment credit applied—1967 |
|---|---|---|
| William J. Bremer, Jr., and Carolyn E. Bremer | 12% | $8,138.00 |
| Milton Mazo | 12% | 8,137.99 |
| Irwin Mazo and Julie Mazo | 12% | 8,138.26 |
| Barney L. Sadler and Ruth S. Sadler | 12% | 8,137.99 |
| Marvin I. Rosenzweig and Gail Rosenzweig | 12% | 8,138.26 |
| Harry Minkovitz and Hazel Minkovitz | 2% | 1,355.97 |
| Erwin A. Friedman and Mary W. Friedman | 12% | [1] 2,842.29 |

[1] Claimed in 1967 and applied as a carryback to 1965 ($583.44) and 1966 ($2,258.85).

Savannah had been organized in 1965 to undertake the restoration of the General Oglethorpe Hotel, a former resort hotel in Savannah which had become idle, and the subsequent operation of the renovated facility. From its inception, Savannah encountered financial difficulties; from 1967 when the refurbished facility was opened for business until February 3, 1970, Savannah never operated at a profit. By February 3, 1970, Savannah was unable to meet its current obligations; it had assets with a total book value of $4.1 to $4.2 million and liabilities in excess of $5 million. On February 3, 1970, the holder of the first mortgage on the property foreclosed the mortgage and all of the assets of Savannah, including those in respect of which it had claimed the aforementioned investment credit, were sold in the foreclosure sale, by auction, to the first mortgagee (who was unrelated to Savannah or any of the petitioners herein). Savannah conducted no business activities after the foreclosure.

On their respective income tax returns for 1970, none of the petitioners reported any recapture of investment credit in respect of the above-specified portions of Savannah's investment credit claimed by petitioners in 1967. In the notices of deficiency issued to petitioners herein respondent determined that the assets of Savannah, upon which the investment credit had been claimed, ceased to be section 38 property when they were sold at the foreclosure sale and the entire investment credits claimed by petitioners on those assets were subject to tax in 1970 under the recapture provisions of section 47.

## OPINION

In the instant case, Savannah Inn & Country Club, Inc., a subchapter S corporation of which the male petitioners herein were shareholders, placed in service in August 1967 certain

property qualifying for the investment credit allowed by section 38,[4] of which credit each petitioner reported in 1967 his proportionate share.[5] We must decide whether the subsequent foreclosure sale of this section 38 property on February 3, 1970, constitutes a disposition within the meaning of section 47(a)(1) thereby rendering petitioners liable for the investment credit recapture tax in respect of their shares of the investment credit claimed for such property.

Section 47(a)(1), the operative provision in controversy, provides as follows:

> SEC. 47. CERTAIN DISPOSITIONS, ETC., OF SECTION 38 PROPERTY.
>
> (a) GENERAL RULE.—Under regulations prescribed by the Secretary or his delegate—
>
> (1) EARLY DISPOSITION, ETC.—If during any taxable year any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, before the close of the useful life which was taken into account in computing the credit under section 38, then the tax under this chapter for such taxable year shall be increased by an amount equal to the aggregate decrease in the credits allowed under section 38 for all prior taxable years which would have resulted solely from substituting, in determining qualified investment, for such useful life the period beginning with the time such property was placed in service by the taxpayer and ending with the time such property ceased to be section 38 property.

Since section 46(c) (relating to the "qualified investment" eligible for the investment credit), as in effect in 1967, required a minimum useful life of 4 years, section 47(a)(1) operates to effect recapture of the entire investment credit previously claimed by petitioners in respect of Savannah's section 38 property[6] if the foreclosure sale in 1970, less than the requisite 4 years from the

---

[4] SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

[5] This "passthrough" effect results by application of sec. 48(e):

SEC. 48. DEFINITIONS; SPECIAL RULES.

(e) SUBCHAPTER S CORPORATIONS.—In the case of an electing small business corporation (as defined in section 1371)—

(1) the qualified investment for each taxable year shall be apportioned pro rata among the persons who are shareholders of such corporation on the last day of such taxable year; and

(2) any person to whom any investment has been apportioned under paragraph (1) shall be treated (for purposes of this subpart) as the taxpayer with respect to such investment, and such investment shall not (by reason of such apportionment) lose its character as an investment in new section 38 property or used section 38 property, as the case may be.

[6] See S. Rept. 1881, 1962-3 C.B. 703, 724.

time the property was placed in service, constitutes a disposition within the ambit of section 47(a)(1).

The language used in section 47(a)(1) is rather clear and definitive: "If * * * property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer." And, as set forth in section 1.47-2(a)(1) of the regulations, "the term 'disposition' includes a sale in a sale-and-leaseback transaction, *a transfer upon the foreclosure of a security interest* and a gift, but such term does not include a mere transfer of title to a creditor upon creation of a security interest." (Emphasis added.) Thus on the basis of the scope of the general language of section 47(a)(1) and the specific reference to foreclosure transactions contained in the regulations thereunder, we might summarily conclude, as respondent urges, that the instant transaction falls within the category of recapture-triggering dispositions.

Such conclusion also finds support in *Henry C. Mueller,* 60 T.C. 36 (1973), affd. in part (on this issue) and revd. in part and remanded on another issue 496 F. 2d 899 (5th Cir. 1974), wherein we held that section 47(a)(1) applies to the transfer from a bankrupt taxpayer to the trustee in bankruptcy.[7]

Petitioners contend, however, that the application of the recapture provisions to the circumstances herein, which petitioners characterize as an involuntary sale of assets of an insolvent corporation, would produce an unfair result not intended by Congress. Generally, petitioners assert that the investment credit was enacted as an incentive to stimulate economic growth by encouraging investment in certain prescribed types of property; toward this end, the recapture rule was designed "To guard against quick turnover of assets by those seeking multiple credit." S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 724. Reasoning that the potential for such abuse

---

[7] Petitioners argue that the "strong dissent" on this issue in the Tax Court opinion in *Henry C. Mueller,* 60 T.C. 36 (1973), affd. in part and revd. in part and remanded on another issue 496 F. 2d 899 (5th Cir. 1974), supports their position. We disagree. The dissent simply took the position that an involuntary conversion does not occur upon the filing of a voluntary petition in bankruptcy, particularly when the trustee in bankruptcy represents both the bankrupt and the creditors.

Further, as to the scope of sec. 47(a)(1), see *Gavin S. Millar,* T.C. Memo. 1975-113, on appeal (3d Cir., Oct. 3, 1975), wherein this Court held that a foreclosure of taxpayer's stock in a subch. S corporation triggered the recapture of investment credit; *Emory A. Rittenhouse,* T.C. Memo. 1975-347, wherein we held that sec. 47(a)(1) admits of no distinction between voluntary and involuntary transactions and accordingly applied the recapture rule to a disposition effected pursuant to the seizure of corporate assets by a creditor; and *Richard D. Lang,* T.C. Memo. 1972-8.

inheres only where the disposal of a taxpayer's original section 38 property yields a return enabling the taxpayer to finance a subsequent reinvestment in qualifying property, petitioners conclude that the foreclosure sale herein, since it affords no such opportunity for abuse, does not warrant application of the recapture rule. Petitioners cite the statement in the Senate Finance Committee Report, *supra,* 1962-3 C.B. at 852-853, that "In general, property will be considered disposed of whenever it is sold, exchanged, transferred, distributed, involuntarily converted, or disposed of by gift" as evidence that Congress contemplated application of the recapture rule only in the event the section 38 property was disposed of voluntarily or in a proceeds-producing transaction. Petitioners emphasize that the instant transaction, by contrast, possesses neither requisite characteristic.

While the thought is appealing, the inference petitioners draw finds no support elsewhere in the committee report or in the law. The sentence immediately preceding the above-quoted sentence in the committee report reads, "Except as provided in section 47(b), whenever section 38 property is disposed of, such property ceases to be section 38 property with respect to the taxpayer." Section 47(b) provides two specific instances in which a disposition does not require recapture, these being a transfer by reason of death and a transaction to which section 381(a) applies, neither of which are similar to a foreclosure sale.

In further support of their position, petitioners invoke by analogy the provisions of section 47(a)(4), now repealed, but which, as in effect on February 3, 1970, the date of the foreclosure sale, in essence created an exception to the recapture rule for property destroyed by casualty.[8] Petitioners argue that section 47(a)(4) evinced a congressional intent to provide relief

---

[8] Sec. 107(a)(1) of Pub. L. 92-178, applicable to casualties and thefts occurring after Aug. 15, 1971, repealed sec. 47(a)(4) which prior to repeal read as follows:

(4) PROPERTY DESTROYED BY CASUALTY, ETC.—No increase shall be made under paragraph (1) and no adjustment shall be made under paragraph (3) in any case in which—

(A) any property is disposed of, or otherwise ceases to be section 38 property with respect to the taxpayer, on account of its destruction or damage by fire, storm, shipwreck, or other casualty, or by reason of its theft,

(B) section 38 property is placed in service by the taxpayer to replace the property described in subparagraph (A), and

(C) the reduction in basis or cost of such section 38 property described in the first sentence of section 46(c)(4) is equal to or greater than the reduction in qualified investment which (but for this paragraph) would be made by reason of the substitution required by paragraph (1) with respect to the property described in subparagraph (A).

Subparagraphs (B) and (C) shall not apply with respect to any casualty or theft occurring after April 18, 1969.

from the onus of recapture where, through no fault of his own, a taxpayer lost possession of the property in respect of which an investment credit had previously been claimed. Thus equating the nature and effect of a casualty loss with that of the fore-closure sale, petitioners conclude that the latter, like the former, is not a circumstance which triggers recapture of the investment credit.

In sum, petitioners regard application of the recapture provisions of section 47(a)(1) as tantamount to imposition of a penalty in circumstances where Congress intended no such effect.

We do not agree with petitioners' analysis of the purpose and effect of the recapture rule of section 47(a)(1). Instead, we characterize section 47(a)(1) not as a penalty provision but more accurately as a requirement that the actual useful life of section 38 property comport with the estimated useful life. This further condition is rendered necessary to the investment credit scheme by virtue of the fact that as of the date a credit is claimed, the actual useful life is simply not known or determinable. Thus, we regard section 47(a)(1) as an adjustment mechanism designed to ensure that taxpayers who avail themselves of the benefit of the investment credit do in fact maintain entitlement thereto.

In so viewing the purpose of section 47(a)(1), we reject the premise upon which petitioners predicate their argument for excepting the instant transaction from the scope of section 47(a)(1). We do not believe that by mentioning the "quick-turnover" type situation, the Senate Finance Committee intended to exclusively define or in any manner circumscribe the scope of the recapture rule but instead simply sought to illustrate a particular instance warranting application of the rule. Congress intended no such restriction but rather contemplated broad application of section 47(a)(1). In furthur explanation of the general provisions of the investment credit, the committee report goes on to state:

Few exceptions are made to the adjustment rule [sec. 47(a)(1)] described above because in no case does this result in a lesser credit than would be available had the useful life of the property been estimated accurately. * * * your committee believed that it was necessary to forego the application of the adjustment rule *only* in the case of the transfer of property by reason of the death of the taxpayer or in the case of corporations where a successor corporation "stands in the shoes" of the predecessor corporation. * * * [1962-3 C.B. at 724. Emphasis added.]

We believe the above-quoted excerpt precludes petitioners' attempt to distinguish the foreclosure sale herein on their theory that section 47(a)(1) covers only those transactions which are voluntary or which provide a return to the taxpayer. See *Henry C. Mueller, supra,* and the cases cited in footnote 7. Thus, we accord no significance to petitioners' emphasis on the purported involuntary character of the foreclosure sale or the absence of gain resulting therefrom.

In conclusion, we find no basis in the statute and regulations thereunder or the legislative history and the case law in respect thereof upon which to exclude the foreclosure sale in issue from the application of section 47(a)(1). We therefore hold that the foreclosure sale constitutes a disposition within the meaning of section 47(a)(1). Accordingly, petitioners are liable for the investment credit recapture tax as determined by respondent.

*Decisions will be entered for the respondent.*